**COMMONWEALTH of Kentucky, Appellant,**

v.

**Yorig Ramon REYES, Appellee.**

No. 87–SC–712–TG.

Supreme Court of Kentucky.

Jan. 19, 1989.

Frederic J. Cowan, Atty. Gen., W.E. Rogers, III, and John L. Atkins, Sp. Asst. Attys. Gen., Hopkinsville, for appellant.

J. Vincent Aprile, II, Asst. Public Advocate, Frankfort and Carey M. Arnold, Louisville, for respondent.

OPINION OF THE COURT

This case comes before us on an appeal by the Commonwealth of Kentucky from an order by Honorable John C. Lovett, sitting as Special Circuit Judge in Christian County. The order appealed from is one sustaining a motion by Reyes to compel the Commonwealth to carry out its written plea bargain agreement.

The plea bargain agreement itself arose from a crime which Judge Lovett describes as "one of the most heinous and infamous

in Christian County history." Two soldiers from Fort Campbell held up a liquor store near the base. They took a large amount of cash. They took jewelry from the two female clerks and then compelled the clerks to undress and perform fellatio on them. They then forced the clerks to lie down on the floor of the cooler at the back of the store; and, at the count of three, they sought to "blow them away," each firing two shots. One victim died instantly, and the other survived.

Investigators discovered that one soldier, later identified as Lavassa Anderson, had purchased a .45 caliber handgun at a pawn shop near Fort Campbell. When he was questioned, he claimed he was in Erin, Tennessee, with Yorig Ramon Reyes, appellee herein, at the time of the crime. Reyes was then questioned, and originally confirmed the alibi. However, the officers were convinced he was lying. After a telephone conversation between the sheriff and the Assistant Commonwealth Attorney, Reyes was told that the Commonwealth Attorney's office had promised not to seek the death penalty if Reyes would tell the truth. He thereupon placed a long distance telephone call to his wife out of state, and then confessed. He made a written statement reciting what Judge Lovett refers to as the "odious" details of the crime and verbally supplied other details. He consented to a search of his quarters at the post, his apartment in Clarksville, and his vehicle. He took the officers to show them the location of some of the money and the jewelry taken from one of the victims. He told the officers who had searched his apartment without finding any money that the money was taped to the bottom of a drawer. The officers then located the money, and some of the money was identifiably marked. The jewelry was carefully hidden in cracks in a parking lot, and other money was concealed under a tree. Reyes even led the officers to the .357 Magnum revolver he had used in the crime.

As to his confession regarding the actual shooting, Reyes stated, "They lay down and turned their faces to each other. I think the one with the dark hair was on the left. I was standing on the right ... we went back in, I was still on the right ... I fired two and he fired two." Reyes said he had shot the girl on the right, "the girl with the bright blonde hair." The deputy sheriff showed Reyes the driver's license of the deceased victim, and Reyes said repeatedly, "I shot her." He positively identified the picture of the deceased victim as the person he shot.

Somehow, the Commonwealth Attorney never did become aware of the fact that Reyes was confessing to killing the deceased victim, and proceeded as if Reyes had shot the survivor. He was indicted for complicity in the murder, and Anderson was indicted for the murder. Between Reyes's June 12, 1985 confession and November 12, 1985, the investigation continued, and much additional evidence was uncovered. Reyes was interviewed repeatedly, and repeatedly answered all questions asked by the Commonwealth Attorney or the various officers. In the meantime, ballistic reports on the handguns and various spent shells and recovered bullets were obtained, laboratory reports were issued, as well as serology reports on shoes, jacket and a towel. The firearms laboratory reports on the shell casings, projectiles, the .45 caliber automatic, and the autopsy report, which included toxicology and X-ray reports, were accumulated.

Anderson's trial was scheduled to begin on December 2, 1985, and appellee Reyes was to be a key witness against him. Reyes, however, insisted upon a promise of immunity from the death penalty before his testimony, and the plea bargaining was resumed. The last plea bargain was reduced to writing and signed on November 12, 1985, exactly five months after Reyes had confessed. After this written agreement was signed, the state continued its preparation for Anderson's trial on December 2, and Reyes's counsel began agitating for the court to accept Reyes's plea. His agitation was probably motivated by the fact that he realized his client had confessed to the actual murder and further by the fact that because of the agreement he had made no adequate preparation for Reyes's defense.

**64**

Just prior to Anderson's trial, Reyes again insisted that he had shot the lady on the right, the "bright blonde" lady, the one he had identified from the picture, and the one who had died from the gunshots.

As the selection of the jury at Anderson's trial proceeded, the prosecutors learned that the autopsy had disclosed particles of lead in the skull of the deceased victim. These particles of lead had originally been thought to be bone fragments, but the X-ray clearly disclosed they were metal fragments. This discovery exploded the prosecution's theory that Anderson had fired the fatal shot, because Anderson's weapon had fired copper clad projectiles which showed, when recovered, they had not fragmented. The .357 Magnum of appellee Reyes had fired ordinary lead projectiles, which had fragmented. Obviously the deceased victim had been killed by bullets fired from the .357 Magnum, which is what Reyes had been trying to tell them all the time. When the prosecution discovered this on the third day of jury selection in the Anderson trial, the prosecution moved for a continuance.

On December 17, 1985, Reyes was indicted for murder, as well as sodomy and robbery. Anderson then entered into his own plea bargain, agreeing to plead guilty to complicity to murder and to the other charges and to cooperate fully and testify truthfully against Reyes.

As stated before, the defense then moved that the plea agreement be enforced, and the Commonwealth bitterly opposed the motion, claiming that Reyes had not been honest with them and they were no longer bound by the agreement. Reyes, on the other hand, argued that he had in fact been honest with the prosecution but they had failed to understand what he had tried to tell them. The Special Judge entered an order requiring the Commonwealth to go through with its plea bargain and in the order stated that it did not decide whether the court would or must accept the mandated recommendation as to the sentences. He further stated that he had not made and did not then make any commitment concerning the recommendation.

This court affirms the order of the Christian Circuit Court.

The remainder of this opinion is copied from the excellent opinion of Special Judge Lovett, as follows:

■ "Justice Brennan in his dissent in *Ricketts, etc. v. Adamson*, 483 U.S. 1, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987) remarked that

This Court has yet to address in any comprehensive way the rules of construction appropriate for disputes involving plea agreements. Nevertheless, it seems clear that the law of commercial contract may in some cases prove useful as an analogy or point of departure in construing a plea agreement, or in framing the terms of the debate ... It is also clear, however, that commercial contract law can do no more than this, because plea agreements are constitutional contracts ... Unlike some commercial contracts, plea agreements must be construed in light of the rights and obligations created by the constitution.

"Many constitutional rights are involved. The due process right to a fair trial; the right against self-incrimination; the right to remain silent; the due process right to fundamental fairness. These, and perhaps others, are necessarily implicated.

"It seems obvious that if the state makes a promise to an accused and the accused takes no action in reliance on the promise, the state may withdraw the offer. No agreement has been reached. There is nothing to enforce. The prosecutor's right to withdraw is equal to his right to withhold an offer. No defendant has a constitutional right to plea bargain. The prosecutor may engage in it or not in his sole discretion. If he wishes, he may go to trial. *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). If the prosecutor makes a plea bargain offer and withdraws it before it is accepted or detrimentally acted upon by the defendant, the defendant will not be heard to complain that his constitutional rights to due process and effective counsel have been violated.

*Government of the Virgin Islands v. Scotland,* 614 F.2d 360 (CA 3, 1980).

"However, if the offer is made by the prosecution and accepted by the accused, either by entering a plea or by taking action to his detriment in reliance on the offer, then the agreement becomes binding and enforceable. Constitutional as well as contractual rights become involved. This is the thrust of *Cope v. Commonwealth,* Ky., 645 S.W.2d 703 (1983) and similar cases in other jurisdictions. In commercial contract law this is offer and acceptance, making a contract, or an offer and detrimental reliance which creates an estoppel preventing withdrawal of the offer. A case to compare is *Adkins v. Commonwealth,* Ky.App., 647 S.W.2d 502 (1983) where the defendant never accepted the state's offer and had taken no action in reliance upon it. 'Here, because appellant never personally accepted the Commonwealth's offer, it remained an offer and was revocable by the Commonwealth at any time.' The element of estoppel was alluded to in *Government of Virgin Islands, supra.* 'When, however, the defendant detrimentally relies on the government's promise, the resulting harm from this induced reliance implicates due process guarantees. This basic estoppel principle was recognized by the Court in *Santabello:* [*Santabello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427] when a defendant pleads guilty in reliance on an agreement with the prosecutor, that promise must be fulfilled.'

"A recent case involving the offer-acceptance concept is *Shanklin v. Commonwealth,* Ky.App., 730 S.W.2d 535 (1987), in which the state offered to recommend certain sentences if the defendant would plead guilty and give a truthful statement concerning his codefendant's involvement. The defendant did both. The state later reneged on its promised recommendations, suggesting that defendant be permitted to withdraw his plea. Defendant refused and insisted on specific performance of the agreement. The Court of Appeals held that the agreement must be specifically enforced because 'Here the appellant did everything he had agreed to do. Justice and fair play, as well as the due process clause of the Constitution, require the state to do likewise.' The court might also have said that ordinary commercial contract law required the state to do likewise.

"Also, as in commercial contract law, if the state and the defendant enter into a plea bargain and both sides perform but the trial judge declines to honor it, after which the parties mutually agree to substitute a new agreement for the old, the court will enforce the new but not the old. Having voluntarily made a new agreement the defendant will not be permitted to renounce the new contract and enforce the old. This is the thrust of *Bush v. Commonwealth,* Ky., 702 S.W.2d 46 (1986).

"*Workman v. Commonwealth,* Ky., 580 S.W.2d 206 (1979), is another example of a fully performed contract. There the state offered to dismiss the charge of murder against the defendant if (a) he would voluntarily take a polygraph test and (b) the test indicated he had no involvement in the murder. The defendant took the polygraph examination which indicated that he had no involvement in the murder. The state reneged on its promise. The only 'detrimental reliance' here was the taking of an exculpatory polygraph test. The Court reversed defendant's conviction of murder and ordered the indictment dismissed with prejudice. There was an offer and acceptance and full performance by the accused, but no detrimental reliance as such. The same result would have been necessary had the agreement been a simple commercial contract.

"But in *Workman,* the court went beyond simply contract law. Acknowledging that the 'question is not whether the Commonwealth's bargain is wise or foolish [but] whether the Commonwealth should be permitted to break its word,' the court said

The record as it was constituted on November 21, 1977, disclosed no rational basis which would relieve the attorney for the Commonwealth from the performance of his bargain or justify the refusal of the trial judge to grant the

**66**

motion to dismiss. We are faced with a hard choice, but in the last analysis we find it less evil that a criminal should escape punishment than that the government should be allowed to welsh on its bargain. *Olmstead v. United States,* supra [277 U.S. 438,] at 470, 48 S.Ct. [564,] at 575 [72 L.Ed. 944 (1928) ] (Holmes, J., dissenting).

■ "Finally, another issue relevant here was present in *Workman.* Is the trial judge bound by the plea agreement? In *Bush, supra,* the court said the trial judge had not reneged on his agreement; in fact, he had not seen it prior to the hearing and he declined to accept the agreement. The necessary implication is that if the trial judge knows of the agreement and concurs in it, he will not be permitted to repudiate it any more than will the Commonwealth's Attorney. *Workman* said:

'[N]o distinction can be taken between the government as prosecutor and the government as judge.' *Olmstead v. United States,* supra [277 U.S.] at 470, 48 S.Ct. at 575 (Holmes, J., dissenting). When as here, our historical ideals of fair play and substantial justice do not permit attorneys for the Commonwealth to disregard promises and fail to perform bargains, it does not permit the judge to allow such iniquities to succeed. *Butler v. State,* Fla.App., 228 So.2d 421, 424–25, 36 A.L.R.3d 1274, 1279 (1969).

"It is undisputed in this case that the late Judge Soyers, trial judge, had read the plea bargaining agreement, had stated that he could live with it, and that he did not intend to permit the Commonwealth to 'welsh' on it. Of course, when he made these observations he did not know that the Commonwealth might have some valid legal reason for repudiating the agreement. Nevertheless, it does appear that Judge Soyers viewed the agreement as reasonable and acceptable and that he intended to enforce it if (a) Reyes performed his part of the bargain, i.e. pled guilty, cooperated in preparing the case against Anderson and testified truthfully at Anderson's trial, and (b) the Commonwealth had no valid reason for voiding the contract.

"The question here, then, is whether a valid and enforceable contract exists. It makes no difference how wise or foolish the contract might have been; it matters not that the agreement, as here, may offend one's sense of justice; it is of no moment that the choice is hard, or that a defendant whose infamous crime merits execution may have his life spared. The state's integrity is at stake. It is less evil that Reyes may escape execution than that the state's integrity be compromised. *Olmstead v. U.S.,* 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (Brandeis, J., dissenting).

"In *Johnson v. Commonwealth,* Ky., 609 S.W.2d 360 (1980), the court, as it was in *Workman,* was faced with a 'hard choice.' Nevertheless, it faced the music, saying 'a criminal conviction should be reversed rather than to permit the government to play an ignoble part.'

■ "But, the Commonwealth argues, the agreement was not enforceable because it was induced by Reyes' lies. Obviously, if a commercial contract is induced by fraud or misrepresentation, it is not enforceable. But, the integrity of commercial written contracts requires that fraud be proved by clear and convincing evidence. No such clear and convincing evidence appears here.

"In fact, it is clear beyond cavil that the Commonwealth had before it when it renounced the agreement the same physical evidence that it had when it made the agreement. True, its interpretation of that evidence changed. However, the same autopsy report and x-rays which convinced the prosecution that Anderson pulled the fatal trigger convinced Anderson's counsel that Anderson did not. The Commonwealth had five months to study and evaluate its evidence in light of Reyes' confession. It failed to find that Reyes' had lied. It then signed the plea bargain. Reyes never claimed that he did not shoot the deceased victim. Rather, he consistently stated that he shot the blonde woman on the right (the decedent), but neither the prosecution nor Reyes' then attorney believed him. They thought he was 'confused.' He rejected their suggestion that

he was confused; he refused 'to take the bait.'

"The state claims that it was misled by Reyes' statements that he 'did not want to kill anyone,' that he 'turned his head' and shot, that he was a superb marksman and easily could have killed the woman if he wished. None of these statements has been proved false. At the time he made these statements and made his full confession, Reyes (except for the sheriff's alleged promise) faced the death penalty, whether he fired the fatal shots or the non-fatal shots. He never denied killing Sheila Harrison. Nor did he ever admit that he did. Strangely, it does not appear that he was ever asked that specific question. Nevertheless, he insisted that he shot the blonde haired woman on the right, and neither the prosecutor nor Reyes' own attorney could convince him that he was in error or even 'confused' on that point.

"The Commonwealth points to the testimony of Rodney Plant as evidence of Reyes' duplicity. It appears that after the Commonwealth repudiated the signed plea agreement, it learned that Mr. Plant, a soldier at Fort Campbell, had important evidence. On January 21, 1987, his deposition was taken. He testified that he visited Reyes in jail. Reyes gave Plant the same description of Anderson's coercion and the same account of the crime as Reyes had told the investigators. However, Reyes added that after he turned his head and fired two shots 'when he looked back he described the way the girl's head looked as you would drop a watermellon (sic), how it was split open, and that is the way the girl's head looked.' Plant said Reyes referred to the girl as 'the light haired girl.'

"The record does not disclose that Reyes was ever asked about how the dead girl looked. Nor, indeed, was Plant asked about this part of his conversation when he was interviewed by investigators in November, 1985. This description of the blonde girl's head after the shooting coincides with Reyes' insistence that he had shot the blonde haired girl and does not contradict his claim that he 'turned his head' and 'tried to miss.' This testimony falls far short of clear and convincing evidence that the written plea agreement was induced by fraud.

"This court finds that the written plea bargain was entered into in good faith by both parties. The written agreement recites that the sheriff had promised Reyes that the state would not seek the death penalty if he made a statement and told the truth about the crimes. He made a full confession. Nothing that he said in his confession has been proved false by clear and convincing evidence. In truth, every material statement of fact in his written confession which was susceptible to verification was verified.

"The preamble to the plea agreement, prepared by the Commonwealth's Attorney, confirms three things: the sheriff had made an offer to Reyes; Reyes had accepted the offer by making a 'complete confession'; and the Commonwealth after five months' intensive investigation had discovered nothing to show that the agreement was fatally flawed by Reyes' lies. This is the stuff that binding contracts are made of.

█ "After the recitals, Reyes made three promises: First, to cooperate with the state in preparation for the trial against Anderson. It is apparent on this record that Reyes gave unstinting cooperation, discussing the case with and answering questions of the state's investigators and the prosecutors on several occasions when called upon to do so. Occasionally, these interviews, contrary to Reyes' counsel's instructions, were conducted without his counsel being present. Reyes incriminated himself and Anderson. Based at least in part on evidence first supplied by Reyes, Anderson has now pled guilty.

"Second, he agreed to testify truthfully in Anderson's trial. He was prepared to testify and had conferred often with the state in preparation to testify. His testimony became unnecessary, not because of anything he did but because the prosecution aborted Anderson's trial and later accepted Anderson's plea agreement.

"Third, he agreed to plead guilty to the charges in the indictment. His current mo-

tions signify his intent to carry out this portion of his agreement.

"Except as he has been prevented from performing by the Commonwealth, Reyes has fully performed. Perforce, it is now the obligation of the Commonwealth to perform. Galling as it is, that is the inevitable conclusion that must be drawn.

"As said in *U.S. v. Carter*, 454 F.2d 426 (CA 4, 1972), 'At stake here is the honor of the government, public confidence in the fair administration of justice, and the efficient administration of justice ...' The state here has given its word. It was not coerced to do so. It was not deceived in doing so. Reyes' confession and implication of himself and Anderson in reliance on that promise mandates that the state keep its word. It appears highly unlikely that Reyes can now receive a fair trial if the state's promise is successfully repudiated.

"The honor of the Commonwealth is truly at stake here. However much the defendant's bloody crime may merit the death penalty, let it not be said that it was purchased with shame and ignominy.

"This opinion and the court's accompanying order go only to the enforcement of the written plea bargain. It does not decide—it is unnecessary to decide—whether, if Reyes enters his guilty pleas as provided in the agreement, this court will or must accept the Commonwealth's mandated recommendations as to sentences."

In his brief, appellee urged this court to insist upon the enforcement of a remark made by Judge Soyers to the effect that he could "live with the agreement." The untimely death of Judge Soyers deprived him of the opportunity to learn the circumstances connected with this case. The appellee did not cross-appeal, and that issue is neither addressed nor decided by this court in this opinion.

The order of the Christian Circuit Court is affirmed.

All concur.