STATE of Minnesota, Respondent,

v.

**Fabrizio MONTERMINI, Appellant.**

No. A11–1543.

Court of Appeals of Minnesota.

Aug. 13, 2012.

---

448

Lori Swanson, Attorney General, John J. Choi, Ramsey County Attorney, Thomas R. Ragatz, Assistant County Attorney, St. Paul, MN, for respondent.

Earl P. Gray, St. Paul, MN; and Mark D. Nyvold, Fridley, MN, for appellant.

Considered and decided by SCHELLHAS, Presiding Judge; KALITOWSKI, Judge; and CHUTICH, Judge.

## OPINION

KALITOWSKI, Judge.

Appellant challenges his convictions of third-degree depraved-mind murder, criminal vehicular homicide, criminal vehicular operation resulting in substantial bodily harm, and five counts of criminal vehicular operation resulting in bodily harm, arguing that (1) the district court erred by vacating his earlier guilty pleas, convictions and sentences for criminal vehicular homicide and criminal vehicular injury and allowing the state to recharge him for these offenses; (2) the district court plainly erred by failing to sua sponte instruct the jury on a lesser-included offense; and (3) the evidence is insufficient to support his conviction of third-degree depraved-mind murder.

## FACTS

Appellant Fabrizio Montermini was the driver of a car involved in a two-car accident on January 13, 2006, that claimed the life of his passenger, B.F., and injured six other people. The undisputed evidence is that, on the evening of January 13, 2006, appellant and B.F. met four friends at a home in Inver Grove Heights to go dancing at Stargate, a Maplewood nightclub. Appellant and B.F. arrived at the home between 7:00 and 7:30 p.m. and appellant began drinking a mixture of vodka and Gatorade. At approximately 8:30 p.m., the group left for Stargate in two cars. There were three passengers in appellant's car. B.F. was seated in the front passenger seat, A.S. was in the rear driver-side seat, and M.C. was seated in the rear passen-

ger-side seat. J.C. drove S.J. in the other car. Appellant continued to drink the vodka-and-Gatorade mixture as he drove.

None of the group members knew how to get to Stargate, so appellant was relying on directions he was receiving by phone from a friend. The two cars initially drove north from Inver Grove Heights toward St. Paul on Highway 52. When he reached I–94, appellant headed west, but missed the exit for I–35E north. Appellant exited the freeway when he realized they were heading in the wrong direction and stopped his car on a side street. When the trailing car arrived, he reentered I–94 heading back east. On this pass, appellant again missed the turn for north I–35E and continued east on I–94 until S.J., with whom he was speaking by cell phone, confirmed that appellant was driving the wrong direction. He exited at Ruth Street, intending to reenter I–94 heading west. But appellant missed the freeway entrance ramp and instead turned west onto Old Hudson Road, a frontage road with a speed limit of 30 miles per hour, at approximately 9:40 p.m. He continued talking to S.J. by cell phone as he approached a curve in the road at between 58 and 61 miles per hour. As he rounded the curve, appellant lost control of the car, which skidded sideways into the oncoming lane, and the passenger side of his car struck the front end of an oncoming vehicle.

The collision left all three passengers of appellant's vehicle unconscious. B.F. suffered a severe head injury and multiple fractures. M.C. suffered a broken femur. A.S. received cuts and bruises. Four occupants of the car appellant struck were also injured. Appellant, who remained conscious, exited his vehicle. He walked down an embankment and urinated, then returned to his car. Despite the efforts of a bystander to stop him, appellant drove up a curb, nearly striking other bystanders, then drove away from the accident scene. He rolled through a red light before turning north on Ruth Street, then accelerated to nearly 80 miles per hour. When appellant came upon an unlit church parking lot, he dragged the unconscious bodies of his passengers from the car onto the cold pavement, then left. When A.S. regained consciousness, she summoned help at a nearby house. An ambulance arrived at 10:07 p.m. At 11:10 p.m., a state trooper stopped appellant's car on I–35E because the car was badly damaged and weaving onto the shoulder. Appellant failed field sobriety tests and was arrested. Based on a blood draw at 12:46 a.m., appellant's alcohol concentration was 0.15.

The state initially charged appellant with one count each of criminal vehicular operation resulting in great bodily harm and criminal vehicular operation resulting in substantial bodily harm. On February 11, 2006, B.F., who had not regained consciousness after the collision, was removed from life support and died. The state informed appellant by letter that it intended to file an amended complaint charging him with additional counts, including third-degree murder, for the death of B.F. The state also moved for an upward durational departure based on aggravating factors. On March 1, 2006, the state filed an amended complaint charging appellant with two counts of criminal vehicular homicide, three counts of kidnapping, and two counts of criminal vehicular operation resulting in substantial bodily harm.

On March 31, 2006, appellant pleaded guilty to criminal vehicular homicide, in violation of Minn.Stat. § 609.21, subd. 1(4) (2004), criminal vehicular operation resulting in substantial bodily harm, in violation of Minn.Stat. § 609.21, subd. 2a(4) (2004), and three counts of kidnapping to facilitate flight, in violation of Minn.Stat. § 609.25,

subd. 1(2) (2004). In exchange for appellant's guilty pleas, the state agreed to dismiss the remaining criminal vehicular homicide and injury charges, not to file additional charges including third-degree murder, and not to seek an upward departure from the presumptive sentences. Appellant agreed that the state could seek permissive consecutive sentences on the kidnapping charges.

At the plea hearing, appellant offered a signed plea petition that he testified his attorney had negotiated with the state and that he had read and understood. In the petition, appellant acknowledged,

[I]f I withdraw the plea, with the court's approval, or if the plea is withdrawn by court order on appeal or other review:

a. I would then stand trial on the original charges.

b. The prosecution could proceed against me just as if there had been no plea of guilty and no plea agreement.

The district court sentenced appellant to three consecutive terms of 48 months for kidnapping, 78 months stayed for criminal vehicular homicide, and 17 months stayed for criminal vehicular injury.

On February 23, 2007, appellant filed a postconviction petition alleging that he had received ineffective assistance of counsel when he pleaded guilty to the kidnapping charges and that his sentences were erroneous. The postconviction court corrected appellant's sentences but denied appellant's motion to withdraw his guilty pleas to kidnapping. On appeal from that denial, this court concluded that appellant had received ineffective assistance of plea counsel, and we reversed and remanded to allow appellant to withdraw his guilty pleas to kidnapping. *State v. Montermini*, No. A06–1640, 2009 WL 1373666, at *7 (Minn.App. May 19, 2009), *review denied* (Minn. Aug. 11, 2009).

On remand, the state filed a motion, which the district court granted over appellant's objection, to vacate appellant's remaining pleas and convictions to criminal vehicular homicide and criminal vehicular injury so as to return the parties to their pre-plea positions. The state then filed an amended complaint charging appellant with additional counts, and the case proceeded to a jury trial.

At trial, appellant admitted that he had been drinking the night of the crash, that he was driving negligently, and that his negligence had caused the death of B.F. and the injuries to the other six victims. He conceded that he was guilty of criminal vehicular homicide and every count of criminal vehicular injury. But he contested his guilt as to third-degree murder and kidnapping.

On those charges, the state produced evidence that appellant began driving at excessive speeds shortly after he left the house in Inver Grove Heights and continued to do so throughout the evening. A.S. testified that she first became concerned about appellant's driving when, as they passed I–494 on Highway 52, appellant started "[s]peeding and swerving in and out of cars into other lanes." J.C. testified that she had difficulty following appellant's car, so she asked him to pull over and let them catch up. Appellant complied, and after J.C. caught up, the two cars turned onto I–94 west from Highway 52.

According to J.C., once appellant entered I–94, "he took off going so fast [she] couldn't even catch up." She called appellant and told him to slow down, but appellant said "no way dog." J.C. testified that she heard screaming in the background. A.S. testified that appellant "was going way over the speed limit and driving crazy." M.C. recalled that appellant was "driving really fast" and was "swerving in and out of cars." Both A.S. and M.C.

testified that they asked appellant several times to slow down and to let them out of the car. At this point, appellant had missed the exit for I–35E north for the first time and exited I–94. J.C., A.S., and M.C. testified that he drove the wrong way down a one-way street before stopping. Because they felt unsafe, A.S. and M.C. testified that they wanted to get out of the car. But A.S. and M.C. explained that they could not exit on the passenger side because a snow bank blocked the passenger-side door. M.C. testified that A.S. grabbed her arm and said, "[C]ome on let's go," and attempted to exit out the driver-side door. But at that moment, appellant returned and closed the door on A.S.'s foot. A.S. was "mad and shocked" and saw that M.C. and B.F. were "freaking out."

Appellant resumed driving on I–94 heading east, and according to M.C., his driving became "worse." A.S. said he was driving "[v]ery, very fast," and estimated he was going 90 miles per hour. M.C. testified that she saw the speedometer indicate the car was going 115 miles per hour. She stated, "I was sitting there screaming for my life asking him to let me out of the car, to pull over and let me out." But according to M.C., appellant would either ignore them or say, "No way, dog."

Appellant testified in his own defense. He admitted that he had been drinking before and during the trip and that he was driving approximately 60 miles per hour on Old Hudson Road just prior to the accident. He also conceded that he may have been weaving between cars to pass them. But appellant disputed the state's evidence regarding speed. He testified that he was only going "a little bit fast," and estimated he was only driving 70 to 75 miles per hour on the freeway. He described the situation in the car as "confusing" and explained that he had gotten lost because

"[he] had been drinking, [he] wasn't paying attention." According to appellant, this confusion was compounded by "multiple phone calls happening in my car at the same time. I'm getting conflicting directions from different people and music's going. We're all—you know, everybody's drinking and all that." Appellant denied that A.S. or M.C. attempted to get out of his car or that he closed the car door on A.S.'s foot. He also testified that he had no memory of events from the time of the collision to when he was booked into jail.

The jury found appellant guilty of third-degree depraved-mind murder, in violation of Minn.Stat. § 609.195(a) (2004); criminal vehicular homicide, in violation of Minn. Stat. § 609.21, subd. 1(2)(i) (2004); criminal vehicular operation causing substantial bodily harm, in violation of Minn.Stat. § 609.21, subd. 2a(4); and five counts of criminal vehicular operation causing bodily harm, in violation of Minn.Stat. § 609.21, subd. 2b(2)(i). Appellant was acquitted of all five counts of kidnapping. The district court sentenced appellant to 174 months for third-degree murder, 13 months to be served concurrently for criminal vehicular operation causing substantial bodily harm, and 365 days in jail to be served concurrently for each criminal vehicular operation causing bodily harm charge.

## ISSUES

1. Did the district court err by vacating appellant's convictions of criminal vehicular homicide and criminal vehicular injury over his objection and permitting new charges to be filed?

2. Did the district court plainly err by failing to sua sponte instruct the jury on a lesser-included offense?

3. Is the evidence sufficient to support the conviction of third-degree depraved-mind murder?

## ANALYSIS

### I.

■ Appellant advances several arguments to support his contention that, on remand from his successful challenge to the kidnapping convictions, the district court erred by vacating his remaining pleas and convictions of criminal vehicular homicide and criminal vehicular injury and by permitting the state to refile new charges. He asks that this court vacate his current convictions and reinstate the original criminal vehicular homicide and criminal vehicular injury convictions. Whether a district court may vacate a plea, conviction, and sentence is a legal issue that we review de novo. *State v. Spraggins,* 742 N.W.2d 1, 3 (Minn.App.2007).

**Waiver**

■ Appellant first contends that the state waived its ability to seek an order vacating his unchallenged convictions, because it should have made its request during postconviction proceedings on his petition to vacate his kidnapping pleas, or on appeal from the denial of that petition. We disagree.

■ Appellant is correct that the principle of waiver generally applies to the state. *See Johnson v. State,* 673 N.W.2d 144, 147 (Minn.2004) (addressing whether the state waived an argument). But waiver "is an administrative rule dictating that appellate courts will not decide issues that were not raised in the [district] court." *State v. Grunig,* 660 N.W.2d 134, 136 (Minn.2003). One purpose of the waiver rule "is to encourage the development of a factual basis for claims at the district court level." *Johnson,* 673 N.W.2d at 147. Waiver does not apply here because the state raised its motion in the district court, the parties fully briefed and argued the issue, and the district court ruled on the

motion and explained its reasoning in a thorough order that is subject to appellate review.

**Scope of remand**

■ Appellant also claims that the district court's decision to vacate the guilty pleas that he did not seek to withdraw and the convictions from which he did not appeal violated the scope of remand articulated in *Montermini,* 2009 WL 1373666, at *7. We disagree.

■■ "[D]istrict courts are given broad discretion to determine how to proceed on remand, as they may act in any way not inconsistent with the remand instructions provided." *Janssen v. Best & Flanagan, LLP,* 704 N.W.2d 759, 763 (Minn.2005). We review a district court's compliance with remand instructions for an abuse of discretion. *Id.*

In *Montermini,* we concluded that the district court erred by denying appellant's request to withdraw the pleas, and we remanded to the district court "to allow such withdrawal and for trial on those charges *or for other appropriate proceedings consistent with our holding.*" 2009 WL 1373666, at *7 (emphasis added). The phrase "for other appropriate proceedings" is a broad mandate that contemplates a wide range of possible proceedings. And this mandate was limited only by the requirement that further proceedings be "consistent with our holding" that appellant be permitted to withdraw his kidnapping pleas. *Id.* The district court's decision to rescind the entire plea agreement, including the kidnapping pleas, is not inconsistent with this holding. For this reason alone, appellant's scope-of-remand argument fails.

But we also note that the district court correctly recognized that our remand instructions must be construed in light of

caselaw granting the district court flexibility to consider the effect of the court of appeals decision on the remainder of the plea agreement. *State v. Lewis*, 656 N.W.2d 535, 539 (Minn.2003). That is because a plea agreement " 'represent[s] a bargained-for understanding between the government and criminal defendants in which each side foregoes certain rights and assumes certain risks in exchange for a degree of certainty as to the outcome of criminal matters.' " *State v. Meredyk*, 754 N.W.2d 596, 603 (Minn.App.2008) (quoting *United States v. Porter*, 405 F.3d 1136, 1145 (10th Cir.2005)). Plea agreements involving multiple crimes are often "intricate" and require a delicate balancing of competing considerations. *State v. Misquadace*, 629 N.W.2d 487, 491 (Minn.App. 2001) (discussing the parties' considerations in the context of a plea involving multiple crimes), *aff'd*, 644 N.W.2d 65 (Minn.2002).

In *Lewis*, the defendant successfully challenged his sentence as to a conviction of a reduced charge arising out of a plea agreement and, the supreme court stated that, on remand, the district court would be "free to consider the effect that changes in the sentence have on the entire plea agreement" and could entertain motions to vacate the conviction and the plea agreement. 656 N.W.2d at 539; *see also Misquadace*, 629 N.W.2d at 491 (stating that, in a plea agreement involving multiple crimes where "[e]verything was interrelated ... it would be inappropriate for this court to make piecemeal corrections without regard to the effect of the corrections on the plea bargain").

Similarly, the district court here explained that "[t]his case involves several interrelated alleged offenses, many of which the [s]tate declined to charge, in exchange for [appellant's] plea of guilty." Most significantly, appellant secured the state's agreement to dismiss the remaining two charges and to forego charging him with the more serious crime of third-degree murder. The state also agreed not to seek an upward durational departure from the sentencing guidelines. In light of these tradeoffs, the district court properly recognized that requiring the state to re-prosecute the kidnapping charges alone, while permitting the stayed sentences for criminal vehicular homicide and injury to stand, would deprive the state of having all counts "considered and sentenced together as part of one 'package' " and would fragment the prosecution.

Because the district court properly construed our remand instructions to permit it to vacate appellant's remaining pleas and convictions and allow the prosecution to proceed anew, the district court did not abuse its discretion in determining the scope of remand.

**Double jeopardy**

 Appellant contends that the district court violated his constitutional protection against double jeopardy by subjecting him to a second prosecution for the same offense. The United States and Minnesota Constitutions contain a prohibition against twice being placed in jeopardy. U.S. Const. amend. V; Minn. Const. art. I, § 7. The Double Jeopardy Clause protects against a second prosecution for the same offense after an acquittal or conviction. *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187 (1977).

The state does not dispute that appellant's initial criminal vehicular homicide conviction for the death of B.F. is the "same offense," for double jeopardy purposes, as his later third-degree murder conviction. And the same is true of appellant's earlier and later convictions of criminal vehicular operation causing substantial bodily harm, both of which relate to M.C.'s injuries.

And there is no question that jeopardy attached to appellant's initial convictions at the latest by June 6, 2006, at which point the district court had accepted the plea agreement, adjudicated appellant guilty of the agreed-upon charges, and sentenced him on the record. *See* Minn.Stat. § 609.02, subd. 5 (2010) (providing that a defendant is convicted when the district court accepts and records a guilty plea); *State v. Jeffries*, 806 N.W.2d 56, 62–64 (Minn.2011) (defining what constitutes acceptance and recording of a guilty plea).

But the conclusion that jeopardy attached is the beginning, rather than the end, of our inquiry as to whether double jeopardy bars reprosecution of the same offense. *State v. White*, 369 N.W.2d 301, 304 (Minn.App.1985), *review denied* (Minn. Aug. 20, 1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). "In a number of situations where jeopardy has attached, it may be interrupted or nullified in a manner that permits further prosecution." 9A Henry W. McCarr & Jack S. Nordby, *Minnesota Practice* § 48.3 (4th ed.2012); *see, e.g., State v. Crow*, 730 N.W.2d 272, 278 (Minn.2007) (stating that defendant's successful appeal on basis of trial error does not bar retrial); *White*, 369 N.W.2d at 304 (stating that defendant waives double jeopardy claim on retrial after mistrial declared with defendant's consent). And like other fundamental constitutional protections, a criminal defendant may knowingly and voluntarily waive his or her double-jeopardy rights. *See Ricketts v. Adamson*, 483 U.S. 1, 10, 107 S.Ct. 2680, 2685–86, 97 L.Ed.2d 1 (1987) (holding that defendant waived double-jeopardy defense by knowingly and voluntarily entering into a plea agreement and subsequently breaching agreement).

Here, the district court concluded that appellant waived the protections of double jeopardy by agreeing in the plea petition that he would stand trial on the "original charges" and he could be retried "just as if there had been no plea of guilty and no plea agreement" in the event he withdrew the plea or the plea was "withdrawn by court order on appeal." The court also concluded that barring retrial would deprive the state of the benefit of its bargain.

Appellant challenges the district court's waiver ruling relying on two recent decisions of the Minnesota Supreme Court addressing double jeopardy in the context of a vacated plea agreement. Appellant contends that *Jeffries*, 806 N.W.2d at 64–65, and *State v. Martinez–Mendoza*, 804 N.W.2d 1, 7, 8 (Minn.2011), establish that the protections of double jeopardy take precedence over the realization of a plea agreement.

In *Jeffries*, the district court accepted and recorded Jeffries's guilty plea to felony domestic assault with the understanding that Jeffries would receive a downward dispositional departure and upward durational departure and be sentenced to a 48–month stayed sentence. 806 N.W.2d at 58–59. At sentencing, the district court sua sponte rejected the plea agreement because it discovered Jeffries's criminal history was more serious than the court had initially believed. *Id.* at 59–60. The case was reset for trial, and Jeffries entered a second plea of guilty. *Id.* at 60. The supreme court held that jeopardy had attached to Jeffries's first guilty plea when the district court accepted and recorded it, and that the second prosecution for the same offense violated the Double Jeopardy Clause. *Id.* at 64. And the court rejected the state's argument that Jeffries had forfeited his double-jeopardy claim by entering a second guilty plea. *Id.* at 64–65.

In *Martinez–Mendoza*, the parties reached an agreement for Martinez–Mendoza to plead guilty to second-degree criminal sexual conduct, which the parties and

the district court assumed would yield a presumptive guidelines sentence of 90 months executed. 804 N.W.2d at 2–3. Before sentencing, the state learned that the presumptive sentence was only 36 months with execution stayed and moved to vacate the defendant's guilty plea or reinstate a charge of first-degree criminal sexual conduct that the state had agreed to dismiss as part of the plea agreement based on mutual mistake. *Id.* at 3–4. The district court denied the motion and the state appealed. *Id.* at 5. The supreme court held that the state had no right to appeal, because jeopardy attached when the district court convicted Martinez–Mendoza and the state's appeal violated Martinez–Mendoza's double-jeopardy rights. *Id.* at 7–8. *Martinez–Mendoza* did not address forfeiture or waiver.

We conclude that *Jeffries* and *Martinez–Mendoza* are inapposite here because they primarily address whether jeopardy attached to the defendants' convictions, an issue not contested here. *Martinez–Mendoza* does not address waiver at all, and to the limited extent *Jeffries* does, it concerns forfeiture in the context of a defendant's entry of a second guilty plea. Those cases are also distinguishable because Jeffries's plea was vacated sua sponte by the district court and the state sought to vacate Martinez–Mendoza's plea.

Here, it was appellant who disavowed the plea agreement when he requested to withdraw his kidnapping pleas. And the district court based its waiver ruling on appellant's agreement in the plea petition that if the plea was withdrawn, the parties would be placed back in their pre-plea positions.

Although this issue has not been addressed by a Minnesota court, the facts of this case are similar to the facts of *Ricketts,* 483 U.S. at 3–4, 8–10, 107 S.Ct. at 2682–83, 2685, where the Supreme Court held that a defendant who repudiates the express terms of a plea agreement waives the protection of double jeopardy. In *Ricketts,* the State of Arizona agreed to dismiss a first-degree murder charge in exchange for Ricketts's guilty plea to second-degree murder and his pledge to testify against two other individuals allegedly involved in the crime. *Id.* at 3–4, 107 S.Ct. at 2682. Ricketts's plea was accepted and he was sentenced. *Id.* at 4, 107 S.Ct. at 2682–83. When Ricketts later refused to testify, the state reinstated the first-degree murder charge, and Ricketts was convicted and sentenced to death. *Id.* at 7, 107 S.Ct. at 2684. On appeal, the Court held that because the defendant violated a clear condition of the plea agreement, he waived any double-jeopardy claim. *Id.* at 10, 107 S.Ct. at 2685–86. The Court reasoned,

> Under the terms of the plea agreement, both parties bargained for and received substantial benefits. The State obtained [Ricketts's] guilty plea and his promise to testify against [the two individuals]. [Ricketts], a direct participant in a premeditated and brutal murder, received a specified prison sentence.... He further obtained the State's promise that he would not be prosecuted for his involvement in certain other crimes.

> The agreement specifies in two separate paragraphs the consequences that would flow from [Ricketts's] breach of his promises.... The terms of the agreement could not be clearer: in the event of [Ricketts's] breach occasioned by a refusal to testify, the parties would be returned to the *status quo ante,* in which case [Ricketts] would have *no* double[-]jeopardy defense to waive. And, an agreement specifying that charges may be *reinstated* given certain circumstances is, at least under the provisions of this plea agreement, *precisely* equiva-

lent to an agreement waiving a double[-]jeopardy defense.

*Id.* at 9–10, 107 S.Ct. at 2685–86 (citation omitted).

Similarly, the parties here bargained for and received substantial benefits under the plea agreement. The state obtained appellant's guilty pleas and the ability to seek a lengthy sentence by requesting consecutive sentences on the kidnapping charges. Appellant obtained the state's agreement not to charge him with the most serious charge, and to forego seeking an upward durational departure. According to the terms of the agreement, appellant expressly acknowledged that, in the event he "withdraw[s] the plea, with the court's approval, or . . . the plea is withdrawn by court order on appeal," he would stand trial on "the original charges" and "[t]he prosecution could proceed against [him] just as if there had been no plea of guilty and no plea agreement."

Appellant argues that this language "falls far short of a legal basis to vacate" the criminal vehicular homicide and injury convictions for two reasons. First, he contends that any waiver of double-jeopardy rights is not valid because it is not explicit. But waiver need not be explicit to be valid. *Ricketts*, 483 U.S. at 9, 107 S.Ct. at 2685 ("[W]e do not find it significant . . . that 'double jeopardy' was not specifically waived by name in the plea agreement.").

Second, appellant urges us to adopt a narrow construction of the waiver provision that permits only the refiling of the "original" kidnapping charges. But this interpretation would ignore the provision's express language allowing the district court to place the parties back in their original positions. And contrary to appellant's assertion, it would allow him to use his double-jeopardy rights as a procedural tool to eviscerate the benefit the state expected from the plea agreement while preserving the benefit he received. The state entered the agreement to avoid trial while obtaining convictions on certain charges filed. If appellant's interpretation prevailed, the state would lose this benefit while appellant retains the benefit of not facing a third-degree murder charge or a motion for an upward departure. *See State v. Williams*, 418 N.W.2d 163, 168 (Minn.1988) ("A plea agreement is in many ways analogous to a contract whose terms will not be enforced to benefit a breaching party."). The state would also lose the benefit of having all charges sentenced together. At sentencing on the plea agreement, the district court imposed a stayed sentence for criminal vehicular homicide and explained that a stayed sentence was appropriate as an incentive for "compliance with probation . . . following [appellant's] release from prison" on the kidnapping charges. This suggests that the court may not have imposed the same sentence without the knowledge that appellant would receive a term of imprisonment for the kidnapping charges lasting 12 years.

We conclude that the reasoning of *Ricketts* is persuasive and that the express language of the plea agreement constitutes a waiver of double jeopardy. Because we rely on the language of the plea agreement, we do not address whether appellant's strategic decision to withdraw the kidnapping pleas was, itself, sufficient to waive his double-jeopardy defense as to his remaining pleas. Accordingly, we conclude the district court did not err by ruling that appellant waived his double-jeopardy claim.

**Serial prosecution**

■■■ Appellant also contends that the district court order vacating his guilty pleas and permitting the state to refile the original charges violated Minn.Stat.

§ 609.035 subd. 1 (2008). Section 609.035, subd. 1, provides:

[I]f a person's conduct constitutes more than one offense under the laws of this state, the person may be punished for only one of the offenses and a conviction or acquittal of any one of them is a bar to prosecution for any other of them. All the offenses, if prosecuted, shall be included in one prosecution which shall be stated in separate counts.

The statute protects criminal defendants from both multiple prosecutions and multiple sentences for offenses resulting from the same behavioral incident. *See State v. Johnson*, 273 Minn. 394, 397, 141 N.W.2d 517, 520–21 (1966). This provision is meant to broaden the protection afforded by double jeopardy. *State v. Schmidt*, 612 N.W.2d 871, 876 (Minn.2000).

But like double jeopardy, "the protection thus afforded is clearly waivable." *Johnson*, 273 Minn. at 405, 141 N.W.2d at 525. In *Johnson*, the defendant was held to have waived the protection of Minn.Stat. § 609.035 "[b]y accomplishing his objective of separating the prosecutions." *Id.* Here, the district court correctly concluded that appellant has accomplished the same by withdrawing his plea as to the most serious charges in the plea agreement and seeking to preserve his conviction and sentence as to the lesser charges. Accordingly, appellant has waived the serial-prosecution protection of section 609.035.

## II.

■ Appellant argues that he is entitled to a new trial because the district court plainly erred when it failed to sua sponte instruct the jury on the lesser-included charge of second-degree culpable-negligence manslaughter under Minn.Stat. § 609.205(1) (2004).

The jury was instructed as to the elements of both charges relating to B.F.'s death—third-degree murder and criminal vehicular homicide. No lesser-included-offense instruction was given. Appellant concedes that he did not request an instruction on second-degree culpable-negligence manslaughter, but he contends that under *State v. Dahlin*, 695 N.W.2d 588, 595 (Minn.2005), and *State v. Leinweber*, 303 Minn. 414, 422, 228 N.W.2d 120, 125–26 (1975), the district court must sua sponte give a lesser-included-offense instruction when the evidence provides a rational basis (1) for acquitting the defendant of the greater offense, and (2) convicting of the lesser-included offense, as he contends it does here. We disagree.

■ The standard appellant cites controls whether a district court must give a *requested* instruction. *Dahlin*, 695 N.W.2d at 598; *Leinweber*, 303 Minn. at 415, 228 N.W.2d at 122. But "when a defendant fails to request a lesser-included-offense instruction warranted by the evidence, the defendant impliedly waives his or her right to receive the instruction." *Dahlin*, 695 N.W.2d at 597–98. "Thus, absent plain error affecting a defendant's substantial rights, a [district] court does not err when it does not give a warranted lesser-included offense instruction if the defendant has impliedly or expressly waived that instruction." *Id.* at 598. Because appellant failed to request an instruction on second-degree culpable-negligence manslaughter, he has waived the issue on appeal and "may not argue that the court erred in not sua sponte giving the instruction." *State v. Penkaty*, 708 N.W.2d 185, 208 (Minn.2006).

■ We recognize that appellate courts have discretion to consider a district court's failure to give a jury instruction if it is plain error affecting substantial rights. *State v. Goodloe*, 718 N.W.2d 413, 422 (Minn.2006) (citing Minn. R.Crim. P.

31.02). Plain error exists if there is an error, that is plain, and that affects substantial rights. *State v. Ramey*, 721 N.W.2d 294, 302 (Minn.2006). But appellant cites no authority holding that the district court's failure to sua sponte give an unrequested lesser-included-offense instruction is plain error. *See State v. Hersi*, 763 N.W.2d 339, 344 (Minn.App.2009) (stating that error is usually plain if it "contravenes case law, a rule, or a standard of conduct"). Moreover, we conclude there was no error here because appellant's decision not to request a lesser-included-offense instruction was a matter of trial strategy. *See State v. Tscheu*, 758 N.W.2d 849, 873 n. 6 (Minn.2008) (Meyer, J., concurring) ("When defendants opt for an all-or-nothing verdict, appellate courts rarely afford relief when, with the benefit of hindsight, the strategy may have been mistaken."). Accordingly, the district court's failure to sua sponte instruct on a lesser-included offense is not plain error and does not warrant a new trial.

### III.

Finally, appellant contends that the evidence does not support his conviction of third-degree murder. In considering a claim of insufficient evidence, our review is "limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989). This court

> will not disturb the verdict if the jury, while acting with due regard for the presumption of innocence and requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense, given the facts in evidence and

the legitimate inferences that could be drawn therefrom.

*Crow*, 730 N.W.2d at 280.

Circumstantial evidence is "entitled to the same weight as direct evidence." *State v. Bauer*, 598 N.W.2d 352, 370 (Minn.1999). But we apply a two-step process to evaluate the sufficiency of circumstantial evidence to support a conviction. *State v. Andersen*, 784 N.W.2d 320, 329–30 (Minn.2010). First, we identify the circumstances proved, and in doing so "we defer ... to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the [s]tate." *Id.* at 329. Second, we independently examine "the reasonableness of all inferences that might be drawn from the circumstances proved[,]" including "inferences consistent with a hypothesis other than guilt." *Id.* "[A] conviction based on circumstantial evidence may stand only where the facts and circumstances disclosed by the circumstantial evidence form a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt." *State v. Jones*, 516 N.W.2d 545, 549 (Minn.1994) (quotation omitted).

A person is guilty of murder in the third degree if the person, "without intent to effect the death of any person, causes the death of another by perpetrating an act eminently dangerous to others and evincing a depraved mind, without regard for human life." Minn.Stat. § 609.195(a); *see State v. Mytych*, 292 Minn. 248, 257, 194 N.W.2d 276, 282 (1972) (listing elements). "The third-degree murder statute was intended to cover reckless or wanton acts committed without regard to their effect on particular persons." *State v. Lee*, 491

N.W.2d 895, 901 (Minn.1992) (quotation omitted).

Appellant contends that the evidence is insufficient to support a finding that his driving evinced a depraved mind. As a preliminary matter, he contends that our sufficiency review may not include any circumstances underlying the kidnapping charges of which he was acquitted because the acquittals render these circumstances unproven. And he asserts that these circumstances include testimony that he was driving at a high rate of speed, that A.S. and M.C. demanded to be let out of the car, that he refused their requests, and that he removed his unconscious passengers from the scene of the accident against their will. But appellant offers no legal authority for this contention and we reject it. The acquittals here shed no light on which circumstances the jury believed or disbelieved; the acquittals only demonstrate that the jury believed the state failed to establish the elements of kidnapping. Also, the acquittals here may simply be an expression of the jury's power of lenity. *See State v. Perkins,* 353 N.W.2d 557, 561–62 (Minn.1984) (discussing the power of lenity and its consequences). And taken to its logical conclusion, the limitation appellant proposes would lead to the absurd result that a reviewing court could not consider evidence underlying the common elements of an offense and a lesser-included offense if the defendant is acquitted of one and convicted of the other. Instead, we rely on our well-established assumption on review that "the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Moore,* 438 N.W.2d 101, 108 (Minn.1989).

Proceeding to our sufficiency review, we conclude that the circumstances proved provide ample evidence to support an inference that appellant acted with a depraved mind. The state proved that appellant drove at high speeds on the freeway while weaving in and out of traffic for an extended period of time, at one point reaching a speed of 115 miles per hour. The state also proved that appellant drove the wrong way down a one-way side street. And just before the fatal crash, appellant was going twice the legal speed limit on a curved frontage road. Furthermore, the state proved that A.S. and M.C. pleaded with appellant to slow down and let them out of his car. Appellant acknowledged their pleas but responded, "No way, dog." Moreover, appellant chose to drive in this eminently dangerous manner despite facing significant impairments and distractions that greatly increased the risk his conduct posed to others. Most importantly, he had consumed a large amount of alcohol. So much alcohol, in fact, that his alcohol concentration was nearly twice the current legal limit three hours after the accident. Appellant faced the additional impairment of being lost and unfamiliar with the roads he was driving on. And finally, he was engaged in numerous phone conversations that distracted him from applying his full concentration to the road, including one at the time of impact.

The egregious nature of appellant's conduct, and the reactions it generated on the part of his passengers, establishes that the conduct was eminently dangerous to human life, that appellant must have been aware he was placing human life at risk, and that he heedlessly disregarded that risk. It also excludes any rational inference that he was merely negligent.

Appellant's actions after the crash are also probative of appellant's depraved mind. *See Davis v. State,* 595 N.W.2d 520, 526 (Minn.1999) (stating that a defendant's state of mind may be "inferred from events occurring before and after the crime"). Appellant continued to place hu-

man life at risk by driving up a curb where bystanders were standing, running a red light, and accelerating to 80 miles per hour on Ruth Street. And more importantly, by leaving the accident scene where emergency personnel had been dispatched, and by dragging his unconscious passengers out of the car in an unlit parking lot where they were less likely to be found, appellant risked an eminently dangerous delay in medical treatment that evinced a disregard for his passengers' lives. The evidence supports the conviction.

## DECISION

The district court did not err when it vacated appellant's pleas and convictions for criminal vehicular homicide and injury, and placed appellant and the state back in their pre-plea positions following appellant's successful challenge to the kidnapping pleas. Nor did the district court plainly err when it failed to sua sponte instruct the jury on a lesser-included offense. And finally, we conclude that the evidence supports appellant's conviction of third-degree murder.

**Affirmed.**