*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1891**

State of Minnesota,
Respondent,

vs.

Brock William Orwig,
Appellant.

**Filed October 24, 2016
Affirmed
Ross, Judge**

Hennepin County District Court
File No. 27-CR-14-33192

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Jean Burdorf, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Michael J. Colich, Colich and Associates, Minneapolis, Minnesota; and

Melvin R. Welch, Welch Law Firm, LLC, St. Paul, Minnesota (for appellant)

        Considered and decided by Ross, Presiding Judge; Hooten, Judge; and Toussaint, Judge.[*]

_____

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**ROSS**, Judge

Police found Brock Orwig in his former wife's garage after he went into her house and bludgeoned her head with a club. The state charged Orwig with attempted first-degree murder, first-degree burglary, and second-degree assault. The jury found Orwig guilty of second-degree assault but acquitted him of the other two charges. Orwig appeals his conviction and sentence, arguing that the evidence is insufficient to sustain his conviction or to support the upward departure from the presumptive sentence. Because we conclude that the evidence of his crime is overwhelming, and because the evidence supports the district court's particular-cruelty basis for departing upward, we affirm Orwig's conviction and sentence.

## FACTS

The state offered the following extraordinary evidence to prove that Brock Orwig broke into his former wife's home and attempted to kill her and that, in the alternative, he at least committed second-degree assault.

Orwig's former wife, L.O., dialed 9-1-1 just after 9:00 one morning in November 2014 to report that she had just been attacked inside her Edina home by a man whom she thought had left the home but was still then in her garage. Officers arrived and went into the garage. They found Orwig on the floor. A kitchen knife was stuck into his back a few inches deep, and he claimed that L.O. had stabbed him. Orwig's injury was not life-threatening, and the circumstances of the supposed stabbing soon became suspicious to police.

Police found L.O. in the house injured and visibly upset, her hair soaking with blood. She told officers that she had just been beaten. She recounted that she had spent the morning getting her daughter, B.O., ready for school. B.O. has special needs, and a school bus picks her up in front of the house shortly after 7:00. L.O. left the house without locking the door. She waited with B.O. and then helped her get settled into her seat on the bus. She spoke with the bus driver, who told L.O. that Orwig was not living where L.O. thought he lived based on her understanding from their ongoing child-custody dispute.

After the bus left, L.O. returned to her house and went into the living room to draft an email to her attorney. L.O. sat on a chair with her laptop computer. She was still wearing her hooded, white coat. She began composing the email. Suddenly she felt a blow to her head. She turned to see a man with his arm raised. He had blond hair and a dark stocking cap, and L.O. did not recognize him.

The man repeatedly hit L.O. on the head with a solid object that turned out to be a club fashioned from a piece of lumber more than two inches thick. L.O. tried to shield herself with her arm. She struggled with the attacker, at one point grabbing the club after he dropped it and hitting him once on the side of his head. He grabbed her by her neck and began strangling her. She tried to pull away and run, but she fell to the floor. The man got on top of her, pinned her arms, and continued choking her. L.O. decided to go limp, feigning death. Soon the man released her throat, got up, and began walking around the house. L.O. tried to lie still on the floor. She heard the man move about the house. It sounded as though he walked into her room and into B.O.'s bedroom, and he opened and closed the basement door. He returned to the living room and pulled up the hood of L.O.'s

3

coat. He put a sofa cushion under her head. He then put a towel over her face and pried her mouth open with his fingers. She continued to lie still. The man put pills in her mouth and, with a piece of tubing, tried to pour a liquid down her throat. It tasted like vodka. He left the room, and L.O. "flicked" the pills from her mouth.

The man returned with a rope. He tied L.O's arms and legs. He removed her shoes and socks and dragged her to the side door. L.O. heard what sounded like the rustling of garbage bags. She heard him using a spray bottle and movement that sounded like he was wiping down the living room floor and furniture. She heard him rummage through her knife drawer. She felt him press the handles of two knives against her fingers. She felt him untie the rope from her arms, remove her coat, and blindfold her. She heard him take her car keys and walk outside through the side door.

Hearing that the man was out of the house, L.O. got up and stumbled with her legs still tied to reach the door. She got there and locked it. She got to a living-room chair and untied her legs. She found her cellular telephone and made the 9-1-1 call.

L.O. and Orwig were taken to separate hospitals for medical treatment. L.O. had multiple lacerations on the back and top of her head, requiring 23 staples. Her right hand was swollen, and the skin of the sides of her neck and jawline were discolored. Police told her for the first time in the hospital that the man they found in her garage was Orwig, her former husband. L.O. appeared to police to have been shocked by that news. They told her that he was found with a knife in his back, and she denied stabbing him.

Orwig's treating physician noted his stab wound and several lacerations on his left forearm. None of his wounds was life threatening. The physician could not tell whether

4

Orwig's wounds were self-inflicted. At the hospital Orwig told police that he had walked to L.O.'s house from his own home, also in Edina.

At the time police entered L.O.'s garage and found Orwig, L.O.'s car was running and its headlights were on. The rear driver's side door was open. The front seats were reclined far back in a manner that L.O. had not left them, and Orwig's backpack was in the backseat. L.O.'s keys were on the garage floor beside the car. Pieces of a broken knife were also on the floor. The broken knife's tip had Orwig's blood on it. Orwig's dark blue jacket was on the floor. His car keys were in its pocket, but his car was nowhere near the property.

Orwig's jacket contained the most peculiar evidence—a sheet of paper having on one side what seems to be a hand-written sort of murder or assault to-do list, and on the other side, a detailed, hand-drawn map marking a route with street names between two endpoints in Hopkins and Edina. The to-do list begins with "in/out" and ends with "4 min up," and it includes, among other things, an entry stating, "meds/booze," "keys/garage/turn car," "wipe down all," "drive and ditch wig/hat/shoes/bat," "garage/back door/tie up," "change/clothes in wash," and "knives/prints." Police followed the map's designated route, which indicated L.O.'s Edina house as one endpoint, to the endpoint in Hopkins eight miles away. There police found Orwig's car parked on a residential street miles from Orwig's home. A handwriting expert eliminated L.O. as the source of the to-do list and also determined that she probably did not create the map. The expert concluded that Orwig probably wrote the list and may have also produced the map. A different forensic expert excluded L.O. along with 99.6% of the general population as having contributed to the DNA mixture found on that document. The expert could not

5

exclude Orwig, however, placing him in the tiny class of 0.4% of the population capable of producing that DNA.

Officers found other evidence in the garage implicating Orwig. They found three white garbage bags with draw-string handles. Orwig's fingerprints were on one of the bags, and all three were smeared with blood and had Orwig's DNA on the handles. One bag contained a Nike hat that belonged to Orwig, a pair of men's athletic shoes, empty soft-drink cans, an energy bar wrapper, a bungee cord, tubing, rope, and speaker wire. The second bag contained a makeshift, square wooden club about 15 inches long and 2 3/8 inches thick. The club was covered with a bloody tube sock, and its handle was wrapped with athletic tape. The third garbage bag contained L.O.'s white coat soaked with her blood. Investigators collected a powdery substance from the coat's collar for testing. It contained compounds typically found in anti-nausea medication and sleep aids. Police found another bag on a garage shelf. That bag contained a dark stocking cap and a bloodstained, blond wig. The blood on the wig was L.O.'s. Investigators examining Orwig's jacket found on it synthetic hair fibers that a forensic scientist determined to have come from the wig.

Police executed a search warrant at Orwig's home. In his garage they located saws and found pieces of wood similar in size, shape, and appearance to the lumber used to make the club. They also found speaker wire, bungee cords, rope, rubber tubing, a pack of energy bars, and empty soft-drink cans. The energy bars and soft-drink cans were the same brand as those found in L.O.'s house, and they also bore the same manufacturing lot numbers. In

Orwig's bedroom police found the single sock that appeared to be the match for the one used as the outer layer of the makeshift club.

The state charged Orwig with attempted first-degree premeditated murder, first-degree burglary, and second-degree assault.

Orwig testified at trial. He claimed that he had spoken with L.O. and that L.O. had invited him to her house to discuss their parenting-time schedule. He said that he woke up at 6:30 the following morning and drove to a friend's house in Hopkins. He said he then decided to walk to L.O.'s house, taking with him soft drinks and an energy bar on the eight-mile hike. He claimed that the reason he did not have his cellular phone or wallet with him is that he had forgotten them at home. He said it took him about two hours to walk to L.O.'s house.

Orwig told the jury that L.O. invited him inside after he arrived and that the two began arguing. According to Orwig, L.O. then attacked him with the makeshift club. He pushed her to the ground in self-defense, he said, but she "bounced right up." L.O. dropped the club when she fell, and Orwig picked it up, but she grabbed a knife from the kitchen counter and slashed at him. He said he hit her in the head with the club "two or three" times to defend himself. He knocked the knife from her hand, and she tackled him. He subdued her, got up, and left the house, "instinctively" grabbing her car keys as he left.

Orwig testified that he fled into the detached garage, hoping to drive L.O.'s car to safety. But he could not figure out how to start the car, he said. He told the jury that L.O. entered the garage and slashed at him with a knife, cutting his arm. When he turned to flee

through a door, L.O. stabbed him in the back. He claimed not to remember anything that happened after that.

Orwig's testimony differed substantially from the account he gave police immediately after he had been taken to the hospital. He had told police he walked to L.O.'s Edina home from his own Edina home on the 5300 block of 70th Street (which is about three miles away from L.O.'s house), not from a residential street eight miles away in Hopkins; he told police that L.O. had not expected him, not that she had summoned him to her home; he told police that she came at him with a knife, and he did not mention any club; he told police that he hit L.O. in self defense, but he said he did not use any weapon to do so; and he told police that he did not know whether he had hurt L.O. as he defended himself.

Orwig could not account for the murder to-do list or the map found in his jacket pocket, nor could he explain how his DNA got on the bloody garbage bags in L.O.'s garage. He implied that L.O. wrote the to-do list and the map herself, imitating his handwriting. But he did not attempt to explain how she could have known to mark the map with the exact remote residential location in Hopkins where he had parked his car eight miles from her house. He did not say how she had time to write the lengthy list and create the detailed map and slip the sheet into his jacket during her alleged club and knife attack on him without his noticing and without her getting any of her own DNA or blood on the paper.

Orwig admitted that the club was his. But he said that it was really a wedge he made to protect his boat motor during trailering. He did not explain why it had tape wrapped around it, appearing to constitute a handle. He admitted the sock was also his. But he

8

implied a story of these items arriving at L.O.'s house by some means other than his taking them there to attack L.O., hinting that L.O. must have stolen them from his house earlier that summer. He said that his home had been burglarized.

The jury found Orwig *not* guilty of attempted, premeditated, first-degree murder and first-degree burglary. It did convict him of second-degree assault. The state asked the district court to impose a sentence that included an upward durational departure, arguing that Orwig committed the crime within L.O.'s zone of privacy and with particular cruelty. Based on the jury's finding that Orwig inflicted multiple blows, the district court departed upward from the 21-month presumptive sentence and imposed a 36-month prison term.

Orwig appeals.

## D E C I S I O N

Orwig challenges his conviction. He argues that the state's evidence was insufficient to convict him of second-degree assault and that the district court erroneously instructed the jury to continue deliberating after it deadlocked. He also challenges his sentence. He argues that the district court erred by sentencing him to an upward durational departure. Neither challenge prevails.

## I

Orwig argues that the state introduced insufficient evidence to convict him of second-degree assault. We assess an insufficient-evidence claim on appeal by determining whether the record includes evidence that, when viewed in the light most favorable to the conviction, supports the guilty verdict. *State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012). We will assume the jury believed the state's witnesses and disbelieved any contrary

9

evidence. *Id.* We will affirm a conviction if the jury, honoring the presumption of innocence and its duty not to convict without proof beyond a reasonable doubt, could reasonably find the defendant guilty. *Id.* The question of whether the jury received enough evidence to convict Orwig of second-degree assault demands an easy answer: yes.

Orwig's confusing, insufficiency-of-the-evidence argument is indirect and atypical, but we first address the issue in the typical fashion. L.O.'s testimony describing the surprise attack, her substantial injuries, and Orwig's admission that he clubbed her head multiple times constitute sufficient evidence meeting every element of second-degree assault. The state has proved that charge if it established that Orwig intentionally assaulted L.O. with a dangerous weapon and inflicted substantial bodily harm. Minn. Stat. § 609.222, subd. 2 (2014); *see also* Minn. Stat. § 609.02, subd. 10 (2014) (defining "assault" as "(1) an act done with intent to cause fear in another of immediate bodily harm or death; or (2) the intentional infliction of or attempt to inflict bodily harm upon another"). Given Orwig's defense, the state also had to disprove beyond a reasonable doubt at least one element of the self-defense claim. *State v. Basting*, 572 N.W.2d 281, 286 (Minn. 1997). The four elements of self-defense are these:

> (1) the absence of aggression or provocation on the part of the defendant; (2) the defendant's actual and honest belief that he or she was in imminent danger of death or great bodily harm; (3) the existence of reasonable grounds for that belief; and (4) the absence of a reasonable possibility of retreat to avoid the danger.

*Id.* at 285. As a collateral element, a defendant cannot prevail on a self-defense theory if he used unreasonably excessive force under the circumstances. *Id.* at 286.

10

The evidence obviously meets all the assault elements. Orwig does not dispute that the club was a dangerous weapon, and he does not dispute that he struck L.O. with it. In presenting his theory of alleged self-defense, he also necessarily admits that his strikes were intentional. His intent is also proved because the evidence, viewed most favorably to the verdict, indicates that he made the club himself and carried it with him specifically so that he could use it to bludgeon L.O. His to-do list detailing various steps in the attack, his map pinpointing the location either from or back to his car on the opposite side of the paper, and his wig-and-cap disguise together prove his extensive premeditation, and his premeditation emphatically corroborates the other evidence of his intent to harm L.O. Orwig does not dispute that L.O. suffered substantial injury.

The evidence is likewise sufficient to disprove Orwig's claim of self-defense. It is true that striking an aggressor in the head with a club might constitute reasonable force to fend off a knife attack, but we can assume from the guilty verdict that the jury either rejected Orwig's claim that L.O. attacked him with a knife or that it found that his striking her was unreasonable, excessive force under the circumstances. And the evidence supports either theory. L.O. testified that Orwig attacked her from behind while she sat typing on her computer unaware that he was present and that he pressed the knife handles against her fingers while she feigned unconsciousness. Orwig's to-do list had an entry of "knives/prints," and he admitted to striking L.O. multiple times with the club. Because we assume the jury rejected Orwig's knife-attack story, we also assume that it likewise construed the knife-stuck-in-the back situation and the small arm cuts as contrivances, part

11

of Orwig's complex cover-up scheme. The evidence readily supports the assault conviction.

We turn to Orwig's more convoluted framing of his insufficiency-of-the-evidence argument. He seems to maintain that because the jury acquitted him of first-degree burglary and attempted first-degree murder, it necessarily found that he did not enter L.O.'s home without her consent intending either to kill her or to commit any other crime. Building on those premises, he essentially contends that the jury must have been (or was logically obligated to be) convinced of the merit of his self-defense claim. We must validate that obligation, he implies, by reversing his assault conviction. His argument is flawed.

Orwig's attenuated argument rests on a misapplication of logic and law. He seeks reversal based on his interpretation of the jury's decision-making process. The logical problem with his argument is that we cannot, by his suggested reverse-reasoning, reconstruct the jury's decision-making process. At oral argument, neither party's attorney could offer any story logically consistent with the physical evidence and the jury's split verdict. Indeed it seems impossible to develop a narrative that reconciles the finding that Orwig violently and repeatedly struck L.O. in the head with a club, with the overwhelming evidence (wig, map, list, car-placement, etc.) of Orwig's substantial planning, and the jury's burglary and attempted-murder acquittals. We cannot reach the conclusion that Orwig urges by drawing inferences from the jury's decision.

But the bigger problem for Orwig's acquittal-premised argument is that it fails on the law. We have recognized that acquittals "shed no light on which circumstances the jury believed or disbelieved." *State v. Montermini*, 819 N.W.2d 447, 461 (Minn. App. 2012).

12

This recognition acknowledges the jury's "lenity" or "nullification" authority, which is its "raw power to bring in a verdict of acquittal in the teeth of the law and the facts." *State v. Perkins*, 353 N.W.2d 557, 561 (Minn. 1984); *see also State v. Hooks*, 752 N.W.2d 79, 86 (Minn. App. 2008) (explaining "the extraordinary power of the jury to issue a not-guilty verdict even if the law as applied to the proven facts establishes that the defendant is guilty"). A defendant is therefore not entitled to a new trial simply because the jury has found him guilty of one count and not of another so as to suggest a logical inconsistency in the verdict. *See State v. Juelfs*, 270 N.W.2d 873, 873–74 (Minn. 1978). Orwig's jury possessed the unrestrained power to acquit him of burglary and attempted murder even if the evidence of his guilt on those charges was overwhelming and his explanation of the evidence was hopelessly incongruous. That the jury acquitted him on those charges therefore has no bearing on the sufficiency of the evidence of his assault conviction.

Orwig also asserts that the district court erred by instructing the jury to continue deliberating after deadlocking. We will not consider reversing the district court based on a brief that offers only a mere assertion of error unsupported by argument or authority unless "prejudicial error is obvious on mere inspection." *State v. Wembley*, 712 N.W.2d 783, 795 (Minn. App. 2006), *aff'd on other grounds*, 728 N.W.2d 243 (Minn. 2007). And the appellant generally bears the burden of providing an adequate record. *Mesenbourg v. Mesenbourg*, 538 N.W.2d 489, 494 (Minn. App. 1995). Orwig does not support his instruction-error claim with argument or authority. He also does not cite to any part of the record showing that a deadlock actually occurred, that the allegedly erroneous instruction was given, or that he objected to this instruction. We discern no obvious prejudicial error

on the face of the record. Orwig has forfeited the argument and we will not address it on the merits.

## II

Orwig argues next that the district court erred by sentencing him based on an upward durational departure. A district court may depart from a presumptive guidelines sentence if the departure is warranted by "substantial and compelling circumstances." *State v. Misquadace*, 644 N.W.2d 65, 68–69 (Minn. 2002). Substantial and compelling circumstances exist when "the facts of a particular case [are] different from a typical case" involving the same offense. *Taylor v. State*, 670 N.W.2d 584, 587 (Minn. 2003). The facts underlying the departure must be found by a jury or admitted by the defendant. *State v. Stanke*, 764 N.W.2d 824, 828 (Minn. 2009). This court reviews departure decisions for an abuse of discretion. *State v. Jackson*, 749 N.W.2d 353, 356–57 (Minn. 2008). A district court abuses its discretion when there is insufficient evidence in the record to justify a departure or when the departure is based on improper considerations. *Id.* at 357.

The jury found that two aggravating facts existed in Orwig's beating of his former wife. The first is that he "assault[ed] the victim in her home" and the second is that "the victim [was] struck on the head more than once." Relying on the second fact, the district court departed upward from the presumptive sentence because that fact established that Orwig committed the crime with particular cruelty.

### Conduct Establishing the Criminal Offense

Orwig argues that the upward departure was improper because the fact that he inflicted multiple blows was part of the conduct that established his assault conviction.

Orwig is correct that conduct that constitutes proof of the criminal offense cannot be a circumstance justifying an upward departure. *See State v. Williams*, 608 N.W.2d 837, 840 (Minn. 2000). As we discussed in the previous section, a second-degree assault charge requires proof that Orwig assaulted L.O. "with a dangerous weapon and inflict[ed] substantial bodily harm." Minn. Stat. § 609.222, subd. 2. Orwig contends that the club used in the assault is a "dangerous weapon" only because he inflicted multiple blows with it. As a result, he maintains, the fact of multiple blows proves an element of the crime and cannot justify the sentencing departure.

The argument rests on a mistaken premise; multiple blows were not necessary for the club to constitute a dangerous weapon. A "dangerous weapon" is defined in part as "any device designed as a weapon and capable of producing death or great bodily harm, . . . or other device or instrumentality that, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm." Minn. Stat. § 609.02, subd. 6 (2014). Whether an object is a dangerous weapon therefore involves both the nature of the object and the manner of its use. *Basting*, 572 N.W.2d at 285.

Orwig accurately observes that the infliction of multiple blows may support the conclusion that an ordinary object was used as a dangerous weapon. *See, e.g.*, *State v. Trott*, 338 N.W.2d 248, 252 (Minn. 1983) (finding three-foot-long board qualified as a dangerous weapon when used to repeatedly beat victim); *State v. Mings*, 289 N.W.2d 497, 498 (Minn. 1980) (holding evidence sufficient to sustain conviction when cowboy boots were used to kick victim repeatedly in the head and chest). But caselaw does not teach that repeated blows are necessary for an ordinary object to be dangerous. To the contrary, it teaches that

15

even a single violent blow may suffice. *See, e.g.*, *State v. Upton*, 306 N.W.2d 117, 117 (Minn. 1981) (affirming defendant's assault-with-a-dangerous-weapon conviction when evidence showed that he took a "pool cue by the thin end and, swinging it like a baseball bat, hit [the victim] in the head, causing a severe cut"); *State v. Cepeda*, 588 N.W.2d 747, 749 (Minn. App. 1999) (holding that beer bottle thrown with sufficient force to break against victim's head was a dangerous weapon). Orwig struck L.O. with multiple blows that each separately laid her head open and required stapling shut. Any one of those blows alone qualified the wooden club as a dangerous weapon.

Although we do not base our decision on it, we add that the record would also support a finding that the club was "designed as a weapon and capable of producing death or great bodily harm" if the jury disbelieved Orwig's boat-motor story. It also would support a finding that it was "intended to be used . . . to produce death or great bodily harm," regardless of how Orwig actually used it. *See State v. Moss*, 269 N.W.2d 732, 736 (Minn. 1978) (holding that the intent to use scissors as a weapon "if their use became necessary" was sufficient to sustain a conviction for aggravated robbery); *State v. Patton*, 414 N.W.2d 572, 574 (Minn. App. 1987) (stating that the jury could have found the defendant used a knife as a dangerous weapon where he brandished it, but did not cause bodily harm). We hold that the district court's finding that the club is a dangerous weapon does not depend on the finding that Orwig delivered multiple blows with it.

### *Particular Cruelty*

Orwig argues that his repeated striking of L.O. is insufficient to prove particular cruelty. He is wrong. The sentencing guidelines contain a "nonexclusive list of factors that

may be used as reasons for departure." Minn. Sent. Guidelines 2.D.3 (2014). The district court based its departure decision on the aggravating factor that "[t]he victim was treated with particular cruelty for which the individual offender should be held responsible." Minn. Sent. Guidelines 2.D.3.b.(2). Cruelty is a matter of degree, making it difficult to say when a departure is justified. *Holmes v. State*, 437 N.W.2d 58, 59 (Minn. 1989). But gratuitous infliction of pain can constitute particular cruelty. *State v. Schantzen*, 308 N.W.2d 484, 487 (Minn. 1981).

Caselaw demonstrates clearly that multiple blows may constitute particular cruelty. *See State v. Kisch*, 346 N.W.2d 130, 131, 133 (Minn. 1984) (affirming particular-cruelty-based upward departure when defendant struck victim's head at least four times with a two-by-four board); *State v. Franson*, 403 N.W.2d 920, 923 (Minn. App. 1987) (upholding departure when the defendant "struck [the victim] repeatedly on the back of the head with a gun"), *review denied* (Minn. June 25, 1987); *State v. Rathbun*, 347 N.W.2d 548, 548 (Minn. App. 1984) ("We need look no further than the fact that to slash and stab a person 23 times is to act with particular cruelty."). The district court did not abuse its discretion by departing on the basis that Orwig committed his assault in a particularly cruel manner by inflicting multiple blows to L.O.'s head.

***Improper Factors***

Orwig argues that the district court considered several improper factors in justifying the upward departure. He maintains that the district court judge inappropriately based the departure on his employment status, education level, and decision to exercise his constitutional rights, as evidenced by her statement that

17

> [Orwig] is clearly an intelligent, and frankly privileged individual. He has a solid gold education, but despite that and his talents that everybody describes, he has been unemployed, and he declared bankruptcy obtaining forgiveness for back child support. His family is apparently bankrolling extensive litigation in three different courts, but has not seen fit to help him with his child support obligations.

The guidelines do identify factors, including employment and education, that are inappropriate for departure. *See* Minn. Sent. Guidelines 2.D.2 (2014). Although the district court did mention Orwig's employment, education, and litigation history in explaining the sentence, the record does not suggest that the court relied on these factors to support the departure. The judge clarified that she based the upward departure solely on the jury's finding that Orwig delivered multiple blows:

> What's before me is a jury verdict that found that Mr. Orwig repeatedly hit [L.O.] over the head, numerous times, with a two by four. That's what the jury found, *and that's all that's before me right now*. . . . I hereby commit you to the Commissioner of Corrections for a period of 36 months. That is a[n] upward departure *based upon the repeated assaults, and the jury finding of that fact*.

(Emphasis added.) Even if we thought the district court's mentioning of the background information was inappropriate, we would not reverse. We will not set aside a sentence in the face of a district court's inappropriate remarks when legitimate reasons supporting an upward departure are evident in the record. *See State v. Simmons*, 646 N.W.2d 564, 570 (Minn. App. 2002), *review denied* (Minn. Sept. 17, 2002). The district court based its departure decision on a valid aggravating factor—particular cruelty—and apparently nothing else. Orwig gives us no reason to alter his sentence.

**Affirmed.**